[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: "P-3B" UNIT CT Page 886
Before the court are two consolidated cases. The first involves negotiations for a collective bargaining agreement between the State and The Connecticut State Employee's Association, representing professional employees in the so-called "P-3B" bargaining unit of state employees.
The second involves negotiations for a collective bargaining agreement between the Federation of Technical College Teachers, Local 1492 and the Board of Trustees for Community Technical Colleges.
Although there are some common issues to each case which justified consolidation, for purposes of clarity, the court will address a separate memorandum to each of the two appeals.
This memorandum will concern only the "P-3B" unit. The "P-3B" unit covers teachers in unified school districts of the State dealing with clients of the Department of Retardation, the Department of Children Youth Services, and the Department of Corrections. In this first "P-3B" case, the parties, the State and the union, had a collective bargaining agreement that was in effect from July of 1985 through June 30, 1989. It was originally a three year agreement and then was extended an additional year from 1988 to 1989. Prior to expiration of the extension, the parties commenced negotiations for a successor agreement early in 1989. During the negotiations both parties filed petitions for declaratory rulings with the State Board of Labor Relations over whether certain proposals constituted mandatory subjects of bargaining requiring the parties to negotiate over them.
This first "P-3B" case is an appeal from the declaratory ruling of the Labor Board on the petition filed by the State holding that certain union proposals were mandatory subjects of bargaining. It is appealed by the State to the court pursuant to Connecticut General Statutes 4-176 (h), governing appeals from declaratory rulings under the Uniform Administrative Procedure Act and 4-183 of the Connecticut General Statutes as well, which is the specific section on appeals under the Uniform Administrative Procedure Act.
The Labor Board ruled on three proposals all of which it held to be mandatory subjects of collective bargaining. The first was a proposal giving super seniority to union stewards, prohibiting CT Page 887 transfers of union stewards to another agency or facility excepting only the case of operational need required to operate the agency or facility. The proposal further prohibited arbitrary transfers of union stewards and gave them a right to an expedited legal procedure over such transfers at step three of the grievance procedure under the contract between the parties. Another pertinent general provision of the prior contractual agreement governs involuntary transfers under the collective bargaining agreement and would bear upon the effect of this super seniority proposal. It is Article 36, Section 6, which places limits on involuntary transfers and requires them to be made in order of inverse seniority and requires commuting distance to be considered.
The second proposal involved the number of student contact days that are required of teachers. Specifically, student contact days in the school year were limited to 183 days effective July 1, 1989, and then 180 days effective July 1, 1990. The minimum number of school days required by state statute 10-16 (d) is 180. This proposal sought to limit the number of student contact days to teachers to no more than the minimum absolutely required by law pursuant to 10-16 of the General Statutes.
A third proposal limited the number of teacher work days as distinguished from the number of student contact days to 185 teacher work days per school year.
The plaintiff appellant claims that the Board's three findings were essentially judgments about what the law requires or forbids in bargaining with state employees, and that these judgments were legally incorrect.
The issues to be decided in this first "P-3B" case derive from the same basic question; are the union proposals of the collective bargaining agreement mandatory, permissive, or prohibited subjects of bargaining. If the proposals are determined to be mandatory subjects of bargaining, then the parties are required to bargain in good faith. NLRB v. Wooster Division, Borg Warner Corp., 356 U.S. 342,75 S.Ct. 718, 2 L.Ed.2d 823. If a matter is found to be a permissive subject of bargaining, then it is at the election of the parties as to whether the proposal will be bargained over and it is not required to be submitted to an arbitrator if the parties cannot agree upon the resolution of the issue. Gen. Stat. 5-278 (g)(1). Mandatory bargaining subjects will be forced, when in impasse, to arbitration. Gen. Stat. 5-278 (g)(1). For a proposal to be considered a mandatory subject of bargaining by law, it must be CT Page 888 within the scope of employee wages, hours, or conditions of employment. Gen. Stat. 5-272(c). In contrast, there are proposals that fall within the scope of negotiations but, instead of being statutorily mandated, enter the category of permissive bargaining at the option of the parties. Gen. Stat. 5-278 (g)(1). When there is a blurring between the wages, hours, and conditions of employment of mandatory bargaining and the subjects of permissive bargaining, difficult adjudicative problems arise. See, generally, West Hartford Education Association v. DeCourcy,162 Conn. 566, 295 A.2d 526 (1972). One final category of bargaining is the prohibited or illegal area of bargaining such as Conn. Gen.5-272 (a)(5), where for example employers and employee organizations are prohibited from bargaining or entering contracts interfering with rights of employees to form a union, or affirmatively encouraging them to do so. These three categories of bargaining; mandatory, permissive, and prohibited by law must be considered in reviewing the appeal from the Connecticut State Labor Board's Actions.
 I.
The court will first turn to the issue of whether or not the proposal giving super seniority to union stewards was properly determined to be a mandatory subject of collective bargaining.
The plaintiff, State of Connecticut, acting by its Department of Administrative Services Office of Labor Relations, claimed that the Labor Board's ruling prejudiced substantial rights it has as an employer because it was affected by error of law in that the union proposal giving union stewards super seniority regarding transfers within their jurisdiction is a nonmandatory subject of bargaining under 5-272 (c) and hence not subject to arbitration proceedings pursuant to 5-278 (g)(1). The plaintiff State claims that Connecticut General Statute 5-272 (a) provides for a duty to bargain in good faith "with regard to wages, hours and other conditions of employment." But it argues that 5-278 (g)(1) provides that nonmandatory subjects of bargaining are not subject to binding arbitration pursuant to Connecticut General Statute5-276a.
The State employer's first argument in this vein is that since General Statute 5-272 (a)(5) prohibits employer discrimination in terms and conditions of employment encouraging union membership, a union proposal giving super seniority to stewards would violate that prohibition by giving union officials a special benefit. It CT Page 889 contends that under the rule of West Hartford Education Ass'n. v. DeCourcy, supra, that similar provisions of the National Labor Relations Act sometimes afford assistance to judicial interpretation of our state act which in some ways is modeled after it. The State cites the case of Dairylea Cooperative, Inc., 219 NLRB 656, 658, 89 LRRN 1737, 1739 (1975), aff'd NLRB v. Teamsters, Local 38, 531 F.2d 1162 (2d Cir. 1976) which was decided under the similar National Labor Relations Act for the proposition that super seniority clauses in collective bargaining agreements, giving preference to union stewards which are not on their face limited to layoff and recall, are presumptively unlawful discrimination encouraging union membership in violation of the statutory ban on such discrimination in terms or conditions of employment under the National Labor Relations Act and that the burden of rebutting the presumption and establishing justification rests on the party asserting their legality. This first union proposal at issue in this appeal provided: "Union stewards will not be transferred involuntarily to an agency or facility except if necessary to meet operational needs. Such transfers shall not be made arbitrarily. Grievances under this section shall be expedited to step 3 of the grievance procedure."
The State's objection to this proposal is that it is an illegal and prohibited subject of bargaining, made unlawful by contravening the prohibitive practice section of the State Employee's Relation Act making it unlawful for the employer to discriminate in terms or conditions of employment, to encourage or discourage union membership or union activities. The State argues that because the record before the State Labor Relations Board Showed in Exhibit 6 that at least one union steward had statewide jurisdiction within the state agency served and others had jurisdiction covering more than one facility, that it follows logically that the transfer of any of those stewards outside their particular facilities would not interrupt or interfere with the continuity of their representation of employees. The State further argues that the union never introduced any evidence and the state board never made any findings suggesting in any way there would be any disruption of the continuity of their representation with respect to those stewards. The State contends it has not challenged the proposal insofar as it seeks to preserve or seeks to prohibit the transfer of stewards whose jurisdiction is limited to a particular department.
The Labor Board argues that the effect of the super seniority provision is to give union stewards more protection from being CT Page 890 either transferred, laid off, or furloughed. The Labor Board distinguishes the Dairylea case by indicating that the NLRB was trying to address in that decision an issue where certain union officials and their friends were given superior contractual benefits to otherwise equal members of the union bargaining unit when in fact that could not be justified by any relation these persons had to the process of collective bargaining. The Labor Board's position is that the evil that Dairylea dealt with was an ingrown cronyism unrelated to any necessary or proper collective bargaining or representational role. The Labor Board points out that in this Connecticut case 41 stewards have been identified by the union as having day-to-day collective bargaining duties with regard to their respective units and that because this is a state bargaining unit it is coextensive with the territorial bounds of the State of Connecticut itself. The Labor Board argues that the language of the proposal, read together with the grievance provision of the contract, makes it clear that the State has the right to involuntarily transfer union stewards. The Labor Board contends that, in reality, what the union stewards received under the proposal was some sort of priority on the basis of seniority with regard to delaying the process of transfer, but that when one looked at the proposal language it is evident that if business necessity required the State to move the stewards, they could be moved. Citing Union Carbide Corporation, 228 NLRB 1152, 95 LRRM 1068 (1977), the Labor Board found that the day by day process of collective bargaining, and implementing agreements including arbitration and the management of petty disputes that arise in the workplace, is found to be an important part of the process of collective bargaining itself. When an individual is legitimately involved in that process on a regular basis, the Labor Board asserts it is entirely appropriate to allow him to have some minimal priority with regard to super seniority without violating the rule of the Dairylea decision. The Labor Board states that it found that the union had met its burden of proof in showing that the persons involved on a regular daily basis were active in the process of collective bargaining, working out agreements, handling arbitrations, and processing and managing the small disputes that arise daily in any large workplace.
Certain provisions of 5-272 of the General Statutes are analogous to provisions of the National Labor Relations Act in that they set out a policy to insulate employees' positions from their union activities; permit free exercise of the worker's right to join unions, to be active or passive members, or to abstain from joining any union at all without impairing their right to a CT Page 891 livelihood. See NLRB v. Milk Drivers Dairy Emp. Loc. 338,531 F.2d 1162, 1163; sustaining Dairylea Cooperative, Inc., supra.
In interpreting the union super seniority proposal, this court has before it only a stipulation of facts agreed to by the State as employer and the union with the assistance of Assistant Labor Relations Agent Kenneth Hampton, which was arrived at before the Labor Board's declaratory ruling. This stipulation is silent about the motives, proper or improper, which prompted the super seniority proposal or similar clauses found in prior collective labor contracts between the union and the State. It is also silent about evidence, if any, of legitimate and substantial business justifications for such a clause which may have the secondary result of encouraging union membership.
The Labor Board's duty in the proceedings before it and ultimately this court's duty on appeal is to determine whether the super seniority clause amounts to any impermissible term or condition of employment encouraging membership in an employee organization in violation of 5-272 (5). It was only in the later proceedings before the State Labor Board which are the subject of this appeal that the importance of this evidence surfaced. This is so because of authoritative case law interpreting analogous provisions of the National Labor Relations Act has established the rule that encouragement of union membership does not, without more, establish violation of the National Labor Relations Act if there is no evidence of improper motive and if there is evidence of substantial business justifications for a clause which has the result of encouraging membership, NLRB v. Milk Drivers Dairy Equip. Loc. 338, 331 F.2d 1162, and puts the burden on the union to prove the proper business justification.
The State argues that the lack of such evidence warrants sustaining the appeal from the declaratory ruling on this issue, as a matter of law, on the basis that there was no evidence of business necessity, and under Dairylea as affirmed by NLRB v. Milk Drivers, supra, it was the obligation and the burden upon the union to prove this. The court rejects this view because: (1) it is not clear to the court that the significance of such evidence was understood or appreciated at the time the original fact stipulation was made; (2) interpretation of state law as to this matter is so closely tied to interpretation of a significant body of federal case law construing the National Labor Relations Act, that the union may not have been fairly on notice of the significance of such evidence from a reading of the Connecticut statute or CT Page 892 Connecticut case law; (3) public employees are forbidden to strike in Connecticut as a means of getting a collective labor contract. Gen. Stat. 5-278a. Disputes in impasse as to what language will form the collective labor contract between the parties therefore cannot result in withholding services as a legal means of settling them, and cannot be settled by statutorily required arbitration to arrive at contract language unless they are mandatory and not illegal subjects of collective bargaining. Therefore the union should be permitted, if evidence exists exempting a contract clause from what would otherwise be a prohibited or illegal subject of collective bargaining, to offer it, so that if such evidence shows the union proposal is not unlawful, the arbitration method contemplated by statute can proceed. Under all these circumstances, fairness warrants the presentation of such evidence if it exists. Therefore, pursuant to the authority vested in this court by 4-183g of the statutes, the matter is remanded to the State Board of Labor Relations for the purpose of hearing any evidence from the union or the employer pertinent to the issues of improper motive or substantial business justification for the contract proposal providing for super seniority for certain union stewards. In addition, the Connecticut State Board of Labor Relations is ordered thereafter to duly make such factual findings as that evidence, together with all other evidence before it and the inferences to be drawn from it warrant and based upon such evidence to issue the declaratory ruling which was petitioned according to the applicable law.
 II.
The court will now treat the second and third union proposals together. Although not the same, they are very similar in that each deals with the hours of employment. The second proposal limits the number of student contact days to 183 in the first year and 180 in the second year of the contract, and thus the ultimate effect of the proposal would be to limit by contract the maximum number of student contact days to the 180 day minimum required by10-16 (d) of the statutes. The third proposal would limit the number of work days (including student contact days and noncontact days) to 185 days. The State Labor Relations Board found both of these proposals to be mandatory subjects of collective bargaining.
The court finds that these two findings were correct statements of the law and this portion of the Labor Board's decision is therefore upheld and the plaintiff's appeal insofar as it related to these items is dismissed. CT Page 893
The second Union proposal about which the parties are at issue provided:
 Effective July 1, 1989, the allowable contact days for ten month employees shall be no more than one hundred eighty-three (183) days.
 Effective July 1, 1990, the allowable contact days for ten month employees shall be no more than one hundred eighty (180) days.
The third Union proposal about which the parties are at issue provided:
 Effective July 1, 1990, the work year for ten (10) month employees shall be one hundred eighty-five (185) days between the dates of September 1, and June 30.
The court notes that 5-272c of the General Statutes, which is part of the State Employee Relations Act, requires the State as employer to bargain in good faith "with respect to wages, hours and other conditions of employment." In 1975, the General Assembly adopted the State Employee Relations Act (SERA), which, for the first time granted state employees the right to bargain collectively. Public Acts 1975, No. 7-5-566 (now codified in General Statutes 5-270, et seq.). State Management Association of Connecticut v. O'Neill, 204 Conn. 746, 747-748.
In interpreting what is mandated by the term "hours" under 5-272c of the State Labor Relations Act, it is helpful to look at provisions of similar collective bargaining laws which incorporate this term "hours of employment" and the Connecticut Teacher Negotiation Act which does not. In interpreting the Connecticut Teacher Negotiation Act, which deals only with teachers employed by municipal boards of education, the Supreme Court noted in DeCourcy that the language of the National Labor Relations Act, Connecticut Labor Relations Act, and the Municipal Employees Relations Act was essentially the same as to the mandatory subjects of collective bargaining and that the interpretation of one is often a useful guide to interpretation of another of these collective bargaining laws. DeCourcy, supra.
Justice Ryan, writing for the DeCourcy majority, distinguished the Connecticut Teacher Negotiation Act's unique language from CT Page 894 other collective bargaining laws in this succinct analysis:
 The Connecticut Teacher Negotiation Act, on the other hand, states that the board of education shall have the duty to negotiate with respect to "salaries and other conditions of employment". The phrase "hours of employment" is omitted. This is highly significant in view of the labor acts previously adopted by the legislature of this state.
DeCourcy, supra, 579. The Court went on to say in ruling that the length of the school day and school calendar were not mandatory subjects of collective bargaining because:
 [t]he omission of the words "hours of employment in the Teacher Negotiation Act evidences a legislative judgment that teachers' "hours of employment" determine students' hours of education and that this is an important matter of education policy which should be reserved to the board of education. (Emphasis added).
DeCourcy, supra, 580.
If the omission in the Teacher Negotiation Act governing municipal teachers was sufficient to warrant elimination of the length of the school day and calendar as subjects of mandatory bargaining for municipally employed teachers, then inclusion of "hours of employment" in provisions of the distinct SERA Act governing state employed teachers provides strong support for the Connecticut State Labor Board's decision that both the second and third proposals were mandatory subjects of collective bargaining.
It has been suggested that since DeCourcy dealt with a distinct statute which excluded bargaining about hours of employment, Justice Ryan's reasoning is merely dicta. Dicta or decisional, if it is a part of the decision, it is a good part; and if it be only dicta, then it is great dicta. Although the Teacher Negotiation Act was amended in 1987 to permit some limited bargaining about the school calendar, Justice Ryan's logic remains compelling.
The State contends that the previously referenced portion of Justice Ryan's decision indicates a decision on the part of the Supreme Court that the length of the school day or year are such matters of educational policy as are a necessary part of CT Page 895 management's prerogative and therefore not a subject of mandatory negotiation.
When one reads the DeCourcy decision, however, it is clear that it did not purport to make some ex cathedral pronouncement of policy concerning the mandatory or prohibited ambit of collective bargaining unrelated to statute. Instead, the court cites the omission of the reference to "hours of employment" in the particular act it was construing, as grounds for the proposition that "hours of employment" were a management prerogative to wit:
 The length of the school day is defined as the number of hours during which a teacher is required to be in attendance at a school each day. School calendar means the number of days and distribution of days during which schools are in session or teachers may be assigned to duties. Under any definition, these items would be "conditions of employment," however, since they are directly related to "hours of employment," it is our conclusion that these matters were specifically excepted from the act with great deliberation. Thus, the length of a school day and school calendar are not mandatory subjects of negotiation.
DeCourcy, supra.
The elected members of the General Assembly who are directly accountable to the people have the power to determine what are mandatory subjects of collective bargaining, and when they have done so by using words with a commonly understood meaning which make it clear that the length of the school calendar must be bargained about, they have set policy which ought to be upheld and enforced by courts of law. See Mazur v. Blum, 184 Conn. 116,118-119; State v. Perruccio, 192 Conn. 154, 164 n. 4, quoting Duartz v. Axton Cross Co., 19 Conn. Sup. 188, 190. "A due regard for the differing functions of the legislative and judicial branches of government requires that the courts refrain from rewriting under the pretext of interpretation, the clearly expressed language of a legislative enactment which the court deems to be preferable to that which the legislation requires. Simonette v. Great American Insurance Co., 165 Conn. 466, 471.
Having rejected the claim made that the proposals concerning contact and noncontact days in the school calendar are not mandatory subjects of collective bargaining by virtue of SERA, the CT Page 896 court will now turn to the question of whether they are prohibited or illegal subjects of collective bargaining by virtue of the existence of other laws.
Although a subject may be an authorized subject of collective bargaining under provisions of SERA, that does not end consideration of the matter. The court must determine whether either proposal concerning the reasonable number of contact or noncontact teaching days is an illegal or prohibited subject of collective bargaining by virtue of conflict with other statutes.
The collective bargaining process and resulting agreements are subject to restrictions and limitations of public policy as manifested in constitutions, statutes and applicable legal precedents. Lieberman v. State Board of Labor Relations, 216 Conn. 253.
The State claims that the employer's duty under "SERA" to bargain collectively with a union over "conditions of employment" ". . . while on its face potentially extend[s] without limit to any aspect of the work environment, [it] must be limited by the conflicting concept of educational policy" according to DeCourcy. This court finds that DeCourcy's logic points out there is a duty to bargain over the school calendar when SERA requires the State to bargain about both "conditions of employment" and "hours of employment", and that length of the school calendar is "directly related to hours of employment". DeCourcy, supra, 580.
The legal question before the court is are there other statutes, constitutions, or applicable legal precedents, which make it an illegal object of bargaining to contract to do what the union proposes as to either student contact days or total teacher work days on the school calendar?
The State maintains that proper application of educational policy limits what must be bargained about mandatorily and this policy is ascertained by examining the sum total of the powers conferred by Conn. Gen. Stat. 10-220 and 10-221. DeCourcy, supra, 583. Section 10-220 (a) requires boards of education maintain good public elementary and secondary schools, and 10-221
(a) requires such boards to prescribe rules for the management, studies, classification, and discipline of the public schools. Section 10-220 (a) further required the boards of education to "implement the educational interests of the state as defined in section 10-4a and provide such other education activities as in its CT Page 897 judgment will best serve the interests of the school district." Pursuant to 10-4a, the State's educational interests include "the concern of the state . . . that each child shall have for the period prescribed in the general statutes equal opportunity to receive a suitable program of educational experiences." In turn,10-16 requires school districts to "provide in each school year no less than one hundred and eighty days of actual school sessions for grades kindergarten to twelve, inclusive, and nine hundred hours of actual school work for grades one to twelve, inclusive." Section 10-220 (a) further requires boards of education to enable children to attend public school "for the period required by law." Section 10-221 (b) requires boards of education to have written policies "concerning homework, attendance, promotion and retention."
In this court's opinion none of these statutes make either union proposal an illegal or prohibited subject of collective bargaining. Only 10-16 sets a statutory minimum number of days in each school year. No subject of collective bargaining should be deemed illegal because of interrelationship with other statutes, unless the proposal conflicts with those other statutes. Lieberman, supra, 253. There is no such conflict in any of the statutes cited by the State in general or in particular in the 180 day minimum school year provided by 10-16 of the General Statutes.
The State also points out that Conn. Gen. Stat. 17a-240
provides that the Unified School District #3 within the Department of Mental Retardation shall operate a twelve month calendar "to provide uninterrupted educational programming for those students whose individualized education programs so require." This requirement is a part of the legislature's determination that there be a special school district within that department, geared to its clients special needs. The State maintains that this statute sets out a policy which makes the union proposal an illegal or prohibited subject of collective bargaining. The Labor Board found that the current contract language provided for a 188 day work year to run "between dates of September 1, and June 30" and that the union proposal reduced that work year to 185 days effective July 1, 1990. The Board found that the State had conceded in the hearing before the Labor Board that the number of teaching work days in a given period would generally be a subject of collective bargaining. The court agrees that the number of days to be worked is a mandatory subject of collective bargaining. There was no evidence in the record before the Labor Board to require a finding that either the second or third proposal regarding the school calendar would prevent the State from carrying on any necessary activities CT Page 898 to fulfill government's statutory duty to provide a suitable education for young retarded persons. The proposal limits its applicability to ten month employees. The binding arbitration procedure which is available to resolve any bargaining impassee on such a mandatory issue gives the employer the forum to present any evidence relevant to its practicality. However, there is nothing in the record before this court to indicate the subject is illegal or prohibited as a subject of bargaining by 17a-240.
Courts presume the legislature knew the history of a statute as judicially construed, Kinney v. State, 213 Conn. 54. That presumption is applied when a court ascertains legislative intent of later amendments to or reenactments to that statute. The legislature should also be presumed to know the judicial construction and import in collective bargaining of the word "hours" the Supreme Court gave in 1972 in interpreting a statute applicable to one set of municipal public employees in the teaching profession, DeCourcy, 580, Gen. Stat. 10-153a to 10-153h; when three years later in 1975 it adopted another law, the State Employees Relations Act, which, inter alia, applied to another set of state public employees in the teaching profession. The legislature is presumed to know when it adopted SERA that work hours and work days and the length of the school calendar were fairly encompassed in its use of the words "hours" "or other conditions of employment" in a collective bargaining statute which would cover state employed teachers, as long as there was no violation of minimum days of schooling which the legislature had set in 10-16 of the General Statutes.
The State urges this court to follow decisions rendered in other states as authority that school calendar issues as a matter of educational policy are outside the scope of mandatory bargaining[1].
The court believes these cases are inapposite because of the rationale of the Connecticut cases on the subject cf. DeCourcy, supra; Lieberman, supra. Professor James has noted the federal trend in interpreting the National Labor Relations Act is to take a broad view of what is encompassed in the phrase "other conditions of employment." Daray, Foy, James and Kingston, Connecticut Labor Relations Statutes and Decisions: Differences From Federal Law, 9 Conn. L. Rev. 4, 536-538 (1977). Judge Edwards recognized the trend to apply principles from the private sector to public sector bargaining and indicated that public employees should not be denied bargaining rights available to others based on platitudes but only CT Page 899 when there are compelling governmental or public policy reasons for such restrictions. Edwards, The Emerging Duty to Bargain, 71 Mich. L. Rev. 885, 932-934 (1973).
The court deems all of these cases from foreign jurisdictions inapposite because they appear to be contrary to the philosophy and ruling expressed in DeCourcy and the policy expressed in our system of laws which provides for collective bargaining for State employees, prohibits strikes and mandates binding arbitration as a means after impasse of determination of contract language. However, many of these cases are also inapposite because the statutes they interpreted are more restrictive than SERA. The Alaska, Kansas and New Jersey statutes these cases interpreted made no mention of the duty to bargain over "hours of employment".[2]
The Alaska, Kansas and Indiana statutes did not mandate collective bargaining for "other conditions of employment". As distinct from Connecticut's statutory scheme, teacher strikes are expressly permitted by statute in Minnesota and, although lack of proper library facilities in Milford limited research, the court could find no prohibition against them in Alaska or Kansas statute law either.[3] Arbitration is not binding in Massachusetts or New Jersey public employee contracts unless the employer agrees to be bound by arbitration.[4] Washington, D.C. has such a completely different collective bargaining statute as to make decisions made under it of little precedential value.[5] In the District of Columbia, all matters are deemed negotiable unless proscribed by one of six categories. The effect of these prohibitions is to leave far less to mandatory bargaining. Thus the decisions are of little precedental value.[6]
Naive views about what constitutes sound educational policy, which are not necessarily grounded in constitution or statute or applicable case law, should not tempt courts of law to change according to some judge made policy the breadth of the public policy expressed in statutes enacted by the legislature setting out what are mandatory and what are prohibited subjects of collective bargaining for public employees. Connecticut's statutory scheme expresses in the SERA Act the breadth of the language of the National Labor Relations Act in permitting collective bargaining about "wages, hours and other conditions of employment." It also prohibits strikes and mandates binding arbitration as a means a final resolution of bargaining impasses about contract content concerning mandatory, legal bargaining subjects. It expresses the common sense of the General Assembly that such a statutory scheme better serves the public interest than the alternative strikes, CT Page 900 slowdowns or other concerted employee efforts that not only can adversely affect education or other public business while they go on, but even after they end.
If the people desire to change that public policy expressed in that statutory scheme, it is constitutionally and best accomplished by their elected representatives in the General Assembly.
For the reasons set out in this memorandum, the court finds the Labor Board's rulings on the second and third proposals involving the number of student contact days and work days were legally correct.
The State's appeal as to them is dismissed.
Flynn, J.